**Electronically Filed
Intermediate Court of Appeals
30172
30-DEC-2013
08:06 AM**

NO. 30172

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I


CUC THI NGO, ANGELO NGUYEN, ANTHONY NGUYEN,
AN VAN NGUYEN, and LEO YOUNG, ESQ., in his capacity
as Personal Representative of the Estate of
Jennifer Giao Nguyen, Deceased,
Plaintiffs-Appellants,
v.
THE QUEEN'S MEDICAL CENTER, a Hawai'i Domestic
Nonprofit Corporation; THINH T. NGUYEN, M.D.;
THE EMERGENCY GROUP, INC., a Hawai'i
Domestic Professional Corporation,
Defendants-Appellees,
and
JOHN DOES 1-10, JANE DOES 1-10, DOE PARTNERSHIPS 1-10,
DOE CORPORATIONS 1-10, DOE BUSINESS ENTITIES 1-10,
DOE NONPROFIT CORPORATIONS 1-10, and
DOE GOVERNMENTAL ENTITIES 1-10,
Defendants


APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CIVIL NO. 07-1-0268)


MEMORANDUM OPINION
(By: Nakamura, C.J., Foley and Ginoza, JJ.)

Plaintiffs-Appellants Cuc Thi Ngo, Angelo Nguyen, Anthony Nguyen, An Van Nguyen, and Leo Young, Esq., in his capacity as Personal Representative of the Estate of Jennifer Giao Nguyen, Deceased (Plaintiffs) appeal from the July 28, 2009 Final Judgment entered in the Circuit Court of the First Circuit.[1] In this medical malpractice action, Plaintiffs sued Defendants-Appellees Thinh Nguyen, M.D. (Dr. Nguyen) and the

---

[1] The Honorable Glenn J. Kim presided.

Emergency Group, Inc.[2] (collectively, Defendants) for negligence and failure to obtain informed consent related to the death of Jennifer Nguyen (Jennifer).

On appeal, Plaintiffs contend the circuit court erred by:

(1) granting Defendants' motion for judgment as a matter of law (Motion for Judgment) because Plaintiffs' expert witness testimony supported their informed consent claim;

(2) refusing to permit Plaintiffs to amend their pleadings to conform to evidence adduced during trial to allege a civil battery claim, and consequently (a) failing to grant Plaintiffs' motion for judgment as a matter of law on their claim for medical battery and (b) failing to allow Plaintiffs' medical battery claim to go to the jury; and

(3) denying Plaintiffs' motion for a new trial.[3]

## I. BACKGROUND

### 1. Jennifer's Death

On Thursday, February 12, 2004, Jennifer, age 9, went with her mother, Cuc Thi Ngo (Mother) to see Jennifer's family physician, Tyronne Dang, M.D. (Dr. Dang) because Jennifer had an ear infection and diarrhea. Dr. Dang gave Jennifer the antibiotic Amoxicillin for her ear infection and instructed the family to call him on Saturday, February 14, 2004. Dr. Dang did not receive any calls from the family on Saturday. Dr. Dang told the Ngo family that he would be moving offices that weekend and to call the Physician's Exchange number to obtain medical care. On Friday, February 13, Jennifer again experienced diarrhea and vomited. Jennifer's father, An Van Nguyen (Father) drove Jennifer, Mother, and Jennifer's two brothers, Angelo Nguyen (Angelo) and Anthony Nguyen (Anthony), to the Queen's Medical

---

[2]      While Queen's Medical Center is named as a defendant, they are not a party to this appeal.

[3]      Plaintiffs' opening brief fails to comply with Hawai'i Rules of Appellate Procedure (HRAP) Rule 28(b)(4) because its statement of points of error fails to state "where in the record the alleged error occurred" and "where in the record the alleged error was objected to or the manner in which the alleged error was brought to the attention of the court or agency." HRAP Rule 28(b)(4). Plaintiffs' counsel are warned pursuant to HRAP Rule 51; future non-compliance with HRAP Rule 28 may result in sanctions.

Center (QMC) emergency room. Anthony, Mother, Father, and Jennifer first spoke to a QMC nurse and then met Defendant Thinh T. Nguyen, M.D. (Dr. Nguyen). Both Jennifer and Anthony could speak English. Mother and Father are not as fluent in English as Anthony. Anthony served as an interpreter for Dr. Nguyen and his parents while Jennifer was in the hospital.

A nurse and Dr. Nguyen asked Jennifer if she was taking any medications and Jennifer told them that she was not. Because Jennifer was overweight, Dr. Nguyen tested her for diabetes. The test results were negative. Based on his physical examination and other test results, Dr. Nguyen diagnosed Jennifer with viral gastroenteritis (inflammation of the gastrointestinal tract), which indicated some type of infectious process. He conducted an orthostatic hypertension test, which indicated that Jennifer was dehydrated. Dr. Nguyen administered Jennifer fluids and ten milligrams of Reglan, an anti-emetic drug (drugs used to treat nausea), by intravenous therapy (IV). Mother, Father, and Anthony were in the room with Jennifer, and all of them testified that they witnessed the IV in Jennifer's arm. While Mother testified she was aware that Jennifer received medicine, both father and Anthony testified they did not notice the introduction of IV drugs.[4]

Mother testified that Jennifer vomited and passed diarrhea near the end of the IV administration; but did not notify the nurse or Dr. Nguyen that this occurred. After the IV

---

[4] Anthony was asked whether he saw anyone inject any medicine into the IV, and he responded, "I didn't notice that." Mother was asked, "did they give Jennifer some medicine using a needle in her arm or in her hand?" Mother responded "Yeah." Father's testimony was as follows:

[Defense counsel:] And you understood she was getting the I.V. because she was dehydrated?

[Father:] Yes.

[Defense counsel:] And you also understood that a medicine was given to stop her from vomiting?

[Father:] Oh, I don't know about that, because about the medicine, the doctor, he don't tell me nothing about what kind of medicine he give to my daughter, and what the medicine work.

There were no further questions concerning whether or not Dr. Nguyen had informed the family that he was administering an anti-emetic intravenously.

was administered, Jennifer said that she felt better, and the nurse gave Jennifer a "by mouth" or "per oral" (PO) challenge, which consists of the oral ingestion of water and crackers or chips. Jennifer passed the PO challenge as she did not vomit or pass diarrhea.

Dr. Nguyen and the nurse told the family to bring Jennifer back to the emergency room if the symptoms got any worse. Dr. Nguyen specifically told the family that if Jennifer had any stomach pain she should be returned to the hospital. Dr. Nguyen also instructed the family to take Jennifer to see Dr. Dang on the following Monday. Dr. Nguyen prescribed Jennifer pills of Reglan to take at home. It is undisputed that Dr. Nguyen did not warn the family about any risks or side effects of Reglan.

The family also received discharge instructions, which stated that if there should be any problems before their appointment with Dr. Dang on Monday, they should call a number listed for QMC. The discharge instructions included Dr. Dang's number.[5] The discharge instructions also instructed the family to return Jennifer to the emergency room if they were concerned, if Jennifer's symptoms got worse, or if Jennifer showed any signs of dehydration. An emergency room attending physician from the Kapiʻolani Medical Center for Women and Children's pediatric

---

[5] The parties dispute whether Dr. Nguyen had agreed to contact Dr. Dang in reference to Jennifer's treatments. Father and Anthony testified that, prior to Dr. Nguyen's discharge of Jennifer, Father asked Anthony to ask Dr. Nguyen to call Dr. Dang to notify him about Jennifer's condition. Dr. Nguyen had told the family he had in fact notified Dr. Dang and that Dr. Dang had approved of the discharge. Angelo and Father claimed that a few weeks after Jennifer's death, they had met with Drs. Nguyen and Dang and Father accused Dr. Nguyen of being a liar for saying he would notify Dr. Dang, when he in fact did not notify Dr. Dang. Father also testified he had called Dr. Dang on Sunday, the day Jennifer died, was angry with Dr. Dang and confronted him because he had thought Dr. Dang had told Dr. Nguyen to send his daughter home.

Dr. Nguyen testified he was never asked by the family to call Dr. Dang. Dr. Nguyen also testified he met with the family and Dr. Dang approximately two to four weeks after Jennifer's death in order to discuss what happened to Jennifer and did not recall anyone accusing him of lying or about calling Dr. Dang. Dr. Dang testified it was apparent from the meeting a few weeks after Jennifer's death that the family had assumed Dr. Nguyen had called Dr. Dang and spoke with him and that he had agreed with the discharge. Dr. Dang did not recall Father accusing Dr. Nguyen of lying at anytime during the meeting held after Jennifer's death. Dr. Dang also testified he never had an argument with Jennifer's father at anytime by phone on Sunday, nor did he learn that father was upset with him from anyone.

intensive care unit treated Jennifer on the day she died and stated that Jennifer had been complaining about abdominal pain at home for two days preceding her cardiac arrest.

After Jennifer and the family returned home from QMC, Anthony called QMC three times – once on Friday night, once early Saturday morning, and a third time Saturday night. During each call, he informed the QMC staff person that Jennifer was still vomiting and passing diarrhea and each time the QMC staff person told Anthony to let the medicine work, and to follow up with Jennifer's doctor on Monday. The family testified Jennifer had the same symptoms on Friday evening and Saturday (vomiting and diarrhea), and that the symptoms did not get any better or any worse. At 3:00 a.m. on Sunday morning, Jennifer woke up and said she was having trouble breathing. Father gave her some water, and she felt better approximately one minute later. On Sunday morning, around 7 a.m., Jennifer became unconscious. An ambulance took Jennifer to Pali Momi Medical Center and then to Kapiʻolani Medical Center for Women and Children, where Jennifer died.

The family did not allow an autopsy to be performed on Jennifer. The death certificate, signed by Dr. Dang, stated the cause of Jennifer's death was cardiac arrest due to, or as a consequence of, hypovolemic shock (where severe blood and fluid loss make the heart unable to pump enough blood to the body).

### 2. Testimony of Gary Leroy Towle, M.D. (Dr. Towle)

Plaintiffs called Dr. Towle to testify as to whether Dr. Nguyen met the standard of care in his treatment of Jennifer and to material risks of Reglan. Dr. Towle testified, inter alia, that in treating Jennifer, Dr. Nguyen breached the standard of care several times. Dr. Towle testified the Reglan manufacturer's insert in effect in 2004 stated that the "[s]afety and effectiveness in pediatric patients has not been established" and that "[t]he safety profile of [Reglan] in adults cannot be extrapolated to pediatric patients."

Dr. Towle testified about other drugs that are safer than Reglan for treating nausea and vomiting in children. Under the circumstances presented by Jennifer's case, he said he would

5

have used Phenergan or Zofran rather than Reglan, because those drugs had been approved for pediatric patients in 2004. Dr. Towle testified that a reasonable physician treating Jennifer in 2004 would have been aware that Zofran and Phenergan were approved by the Food and Drug Administration (FDA) and on the market. He stated, "[t]he problem with Reglan is that one of the ways it works is it increases the motility of the stomach and small intestine. In other words, it gets it going, it gets things flowing through it."

On cross-examination, Dr. Towle testified, "one of the side effects for all of the anti-emetics is possible diarrhea." Dr. Towle further testified to diarrhea as a risk of Reglan's role in increasing gastric motility:

> [Plaintiffs' counsel:] Now you talked about risks with Reglan, about increasing gastric motility?
>
> [Dr. Towle:] Yes.
>
> [Plaintiffs' counsel:] Could you explain that a little more?
>
> [Dr. Towle:] Well, one of the ways Reglan works is that it gets the pylorus, or the sphincter between the stomach and small intestines, to relax and open up and allow the contents of the stomach to pass through to the small intestine.
>
> [Plaintiffs' counsel:] Would you look please at the exhibit before you under Contraindications on the first page. You see where it says "metoclopramide should not be used whenever stimulation of gastrointestinal motility might be dangerous"?
>
> [Dr. Towle:] Yes.
>
> [Plaintiffs' counsel:] Is that what you're talking about?
>
> [Dr. Towle:] Yes.
>
> [Plaintiffs' counsel:] And in this case, in Jennifer's case, was increasing or stimulating gastrointestinal motility as she was sent home from the hospital something that you wanted or didn't want?
>
> [Dr. Towle:] Well, it -- it could increase her diarrhea. It doesn't directly affect the lower intestine so it's not going to cause diarrhea in and of itself. But if you're emptying the stomach and you're dumping things into the small intestine, it kind of gets the intestines going and diarrhea is one of the more common side effects with Reglan.

Dr. Towle could not say to a reasonable degree of medical probability that Reglan had caused harm. In response to

questions about Reglan's increase of the risk of harm, Dr. Towle testified:

> [Plaintiffs' counsel:] Now let's go back to the Reglan. Am I correct that in your opinion that -- you've told us it shouldn't have been given to her but it was given. To a reasonable medical probability, do you believe it increased the nausea and diarrhea?

> [Dr. Towle:] I can't say that.

> [Plaintiffs' counsel:] Can't say. All right. Do you believe it had any side effects that were of consequence to this girl?

> [Dr. Towle:] I can't say one way or the other.

> [Plaintiffs' counsel:] Were there risks to giving it of which the parents should have been warned? You say it shouldn't have been given so --

> [Dr. Towle:] Yeah.

> [Plaintiffs' counsel:] It's a little hard to talk about. If you do give it, you warn of the risks?

> [Dr. Towle:] It's like asking what's the dose of some medicine you're not supposed to give. I can't answer that.

The circuit court asked Dr. Towle to clarify his opinion on Reglan's material risks:

> [circuit court:] You were asked, I believe, by one of the counsel as to whether in your opinion the material risks of giving the Reglan to this girl in the [emergency room] in this situation should have been disclosed to the parents and I heard you say, I can't answer that because your opinion basically is it should not have been given, period?

> [Dr. Towle:] Correct.

> [circuit court:] So do I understand you correctly that your opinion is that Reglan, giving the Reglan was a breach of the standard of care, should not have been given no matter what; is that what you're saying?

> [Dr. Towle:] Should not have been given no matter what in these circumstances.

> [circuit court:] In these circumstances?

> [Dr. Towle:] Yes, yes.

> [circuit court:] So that, and again I don't want to put words in your mouth, but as I understand your opinion, your answer to the question of, well, shouldn't the risks have been explained to the parents, as I understand your opinion, you don't even get to that, you can't answer that one way or the other, you don't even get to that in your mind because it shouldn't have been given in the first place?

> [Dr. Towle:] That's correct.

3. Testimony of James D. Gallup, M.D. (Dr. Gallup)

The circuit court precluded Plaintiffs' expert witness, pathologist Dr. Gallup from testifying as a standard of care witness in this case. The circuit court limited Dr. Gallup's testimony on the mechanism and effects of Reglan. Plaintiff's counsel assented; stating Dr. Gallup was offered "solely on the issue of whether Reglan was a causative agent in Jennifer's death[.]"

Dr. Gallup testified on the effects of Dr. Nguyen's IV administration of ten milligrams of Reglan to Jennifer:

[Plaintiffs' counsel:] Okay. Do you have an opinion as to what effect, if any, that injection intravenously of the ten milligrams of Reglan had on Jennifer's system?

[Dr. Gallup:] Yes, I do.

[Plaintiffs' counsel:] Can you explain that, please?

[Dr. Gallup:] I believe that it did what Reglan is noted well to do and that is stimulate the contraction of smooth muscle, particularly in the intestine and the stomach to a lesser extent.

[Plaintiffs' counsel:] And what is-in your opinion what was the result of that?

[Dr. Gallup:] Well, I think that the diarrhea that Jennifer Nguyen came in with I think it was increased probably quite significantly.

[Plaintiffs' counsel:] When you say "probably" reasonably medically probably-

[Dr. Gallup:] Yes.

[Plaintiffs' counsel:] — quite significantly?

[Dr. Gallup:] Yes.

[Plaintiffs' counsel:] By the drug?

[Dr. Gallup:] Yes.

Dr. Gallup explained that Reglan administered by IV relaxed the pyloric sphincter and stimulated peristalsis in the small intestine, and probably increased the presentation of fluid through the bloodstream into the small intestines.

Dr. Gallup testified to the effects of the Reglan administration to Jennifer:

[Plaintiffs' counsel:] And in your opinion to a reasonable medical probability did the action of the Reglan cause or contribute to an increase in diarrhea and fluid loss?

[Defense counsel:] Objection, leading.

[circuit court]: Overruled.

. . .

[Plaintiffs' counsel:] Did the injection of Reglan cause or increase the amount of fluid that was in Jennifer's system that was excreted out by diarrhea?

[Dr. Gallup:] Yes.

[Plaintiffs' counsel:] Okay. And you are able to say to what degree it did that, mild, moderate, strong?

[Dr. Gallup:] At least moderate.

[Plaintiffs' counsel:] And did that add -- do you have an opinion whether that increased her dehydration?

[Dr. Gallup:] Yes.

[Plaintiffs' counsel:] And what is your opinion?

[Dr. Gallup:] Oh, yes, it would.

[Plaintiffs' counsel:] Significantly?

[Dr. Gallup:] Yes.

[Plaintiffs' counsel:] Do you have an opinion as to whether that increase in dehydration was a substantial factor in leading to her hypovolemic shock?

[Dr. Gallup:] Yes.

[Plaintiffs' counsel:] And what is your opinion?

[Dr. Gallup:] It quite significantly hastened the loss of workable fluid in the lean body mass which I'll go into in a minute into the fluid into the intestinal tract and loss from the body ultimately.

Dr. Gallup did not address effects of the Reglan tablets Jennifer ingested because she may have vomited the tablets out before they exerted any physiological effects. On cross-examination, Dr. Gallup admitted there is evidence that the degree of Jennifer's vomiting and the incidents and degree of diarrhea remained the same during the 36 hours Jennifer remained at home and before her cardiac arrest. Dr. Gallup was not asked to respond to questions regarding the materiality of risks of Reglan.

4. Testimony of Dr. Nguyen

Plaintiffs called Defendant Dr. Nguyen as their witness. Dr. Nguyen testified he ordered a nurse to give Jennifer an IV dose of Reglan and later prescribed her Reglan

tablets. Before he ordered IV administration of Reglan for Jennifer, Dr. Nguyen said he informed the parents he was giving Jennifer medication for nausea and obtained their agreement to this treatment. Dr. Nguyen did not tell the parents of any risks involved with Reglan. Dr. Nguyen admitted he was aware the Reglan manufacturer had indicated the "safety and effectiveness [of Reglan] in pediatric patients" was not established at the time he prescribed it to Jennifer.

Dr. Nguyen testified one of the side effects of Reglan is diarrhea. When asked whether he knew whether there was a safer alternative drug available on the market, Dr. Nguyen responded that he knew there was a drug "out there," but he did not use it because in his memory, "it wasn't available to me to use." Dr. Nguyen was apparently referring to the drug Zofran. Dr. Nguyen admitted Zofran was on the market in 2004.

Dr. Nguyen testified further that throughout his training at Brooklyn Hospital, all pediatric emergency physicians used Reglan because it had less side effects and was considered safe. His pediatrics professor used it "hundreds of times" during Dr. Nguyen's four years at the Brooklyn Hospital, and Dr. Nguyen used it "at least 50 times" during that period. Reglan became the anti-emetic that Dr. Nguyen was most familiar with.

Dr. Nguyen admitted the prescribing guidelines for Reglan did not recommend it for pediatric use, but asserted his off-label use of Reglan on pediatric patients is a common off-label use. Off-label use of a drug means that a drug is used to treat conditions that it is not specifically approved for by the FDA. Dr. Nguyen opined that doctors have the ability to exercise medical judgment in employing off-label uses of drugs like Reglan. He read a passage from the Physician's Desk Reference: "the FDA has also recognized that the FDNC [sic; Federal Food, Drug, and Cosmetic Act] does not however limit the manner in which a physician may use an approved drug. Once a product has been approved for marketing, a physician may choose to prescribe it for uses or in treatment regimens or in patient populations that are not included in approved [labeling]." Reglan was approved for the use of treating vomiting in adults. Dr. Nguyen

stated he used appropriate standards of care in treating Jennifer with the IV administered Reglan.

### 5. Testimony of Vincent Ritson, M.D. (Dr. Ritson)

Defendants called Dr. Ritson, a member of the Hawai'i Emergency Physicians Association, Inc., who was qualified as an expert in the field of emergency medicine, including emergency pediatric medicine. Dr. Ritson testified Dr. Nguyen's diagnosis was accurate, his treatment complied with the standard of care, and it was reasonable to send Jennifer home after having passed the PO challenge. He testified further that Reglan was commonly used to treat nausea and vomiting in children in 2004; administering Reglan by IV and tablet complied with acceptable standards of emergency medicine; and he did not think the nausea and vomiting alone caused Jennifer's death because the more likely cause of death was an overwhelming sepsis infection. In other words, Jennifer may have died from the same infection that caused the nausea and vomiting to begin with. Dr. Ritson disagreed with Dr. Gallup's conclusion that the IV administered Reglan caused an increase in diarrhea which led to Jennifer's dehydration, which then led to Jennifer's death. Dr. Ritson testified he has worked with other physicians that have used Reglan in pediatric cases and he has seen it in use for gastroenteritis, nausea, and vomiting. He testified to previous clinical trials that compared Zofran and Reglan, Reglan placebo, and other medications, and showed Reglan was effective and did not have high risk side effect profiles associated with its use. Dr. Ritson did not cite these comparative clinical trials of alternatives to Reglan treatment in his reports or discuss them in his deposition.

### II. PROCEDURAL HISTORY

On February 12, 2007, Plaintiffs filed their medical malpractice complaint against QMC, Dr. Nguyen, the Emergency Group, and several Doe entities in circuit court. Plaintiffs asserted negligence and informed consent claims against Dr. Nguyen.[6]

---

[6] On November 12, 2009, Plaintiffs and QMC stipulated the complaint and cross-claims against QMC would be dismissed with prejudice.

At the close of their case in chief, Defendants moved for judgment as a matter of law on the issue of informed consent, arguing there was no expert testimony concerning the materiality of the risk with respect to Reglan. Plaintiffs cross-motioned for judgment as a matter of law on their informed consent and civil battery claims. Plaintiffs also moved to amend the pleadings to assert a battery claim, and for judgment as a matter of law on the battery claim. The circuit court granted Defendants' motion on the informed consent issue, holding that Plaintiffs had no legal "cognizable claim" for informed consent. Plaintiffs again moved to conform the pleadings to the evidence to assert the claim of battery and the circuit court denied their oral motion. Plaintiffs also motioned to conform the pleadings to the evidence and to allege a breach of fiduciary duty claim and a claim for failure to disclose the off-label risk of Reglan. The circuit court again denied this oral motion.

The evidentiary portion of the trial was completed on March 11, 2009. Plaintiffs moved for judgment as a matter of law on the issue of negligence and the circuit court denied this motion. On March 16, 2009 the jury gave its verdict in favor of Defendants, finding Dr. Nguyen was not negligent in his care and treatment of Jennifer. On July 28, 2009, the circuit court entered a certified Final Judgment pursuant to Hawai'i Rules of Civil Procedure (HRCP) Rule 54(b) in favor of Defendants and against Plaintiffs.

On August 10, 2009, Plaintiffs filed a "Renewed Motion to Amend the Complaint to Conform to the Evidence and Renewed Motion for Judgment as a Matter of Law, or, in the Alternative, Motion for a New Trial" (Renewed Motion). On October 5, 2009, Defendants filed their opposition, and on October 9, 2009, Plaintiffs filed their reply to the Renewed Motion. At an October 14, 2009 hearing, the circuit court denied the Plaintiffs' motion. On October 15, 2009, the circuit court filed its "Order Denying Plaintiffs' Renewed Motion to Amend the Complaint to Conform to the Evidence and Renewed Motion for Judgment as a Matter of Law, or, in the Alternative, Motion for a New Trial (Filed 8/10/09)" (Order Denying Renewed Motion).

On November 13, 2009, Plaintiffs filed a notice of appeal from the circuit court's July 28, 2009 Final Judgment and October 15, 2009 Order Denying Renewed Motion.

### III. STANDARDS OF REVIEW

A. Motion For Judgment As a Matter of Law

> It is well settled that a trial court's rulings on motions for judgment as a matter of law are reviewed *de novo*.
>
> When we review the granting of a [motion for judgment as a matter of law], we apply the same standard as the trial court.
>
> A [motion for judgment as a matter of law] may be granted only when after disregarding conflicting evidence, giving to the non-moving party's evidence all the value to which it is legally entitled, and indulging every legitimate inference which may be drawn from the evidence in the non-moving party's favor, it can be said that there is no evidence to support a jury verdict in his or her favor.

Aluminum Shake Roofing, Inc. v. Hirayasu, 110 Hawai'i 248, 251, 131 P.3d 1230, 1233 (2006) (citation omitted).

B. Motion to Amend Pleadings to Conform to the Evidence

Appellate courts review a "denial of leave to amend a complaint under HRCP Rule . . . 15(b) under the abuse of discretion standard." See Kamaka v. Goodsill Anderson Quinn & Stifel, 117 Hawai'i 92, 104, 176 P.3d 91, 103 (2008) (citing Hamm v. Merrick, 61 Haw. 470, 473, 605 P.2d 499, 502 (1980)).

C. Motion for a New Trial

"Both the grant and the denial of a motion for new trial is within the [circuit] court's discretion, and [the appellate court] will not reverse that decision absent a clear abuse of discretion." Kawamata Farms, Inc. v. United Agri Prods., 86 Hawai'i 214, 251, 948 P.2d 1055, 1092 (1997) (citation and internal quotation marks omitted). "A court abuses its discretion whenever it exceeds the bounds of reason or disregards rules or principles of law or practice to the substantial detriment of a party." Abastillas v. Kekona, 87 Hawai'i 446, 449, 958 P.2d 1136, 1139 (1998) (citation, internal quotation marks, and ellipsis omitted).

IV.  DISCUSSION

**A.  Judgment as a matter of law on Plaintiffs' informed consent claim**

Plaintiffs contend the circuit court erred in granting Defendants' Motion for Judgment.

Patients are entitled to be provided with specific information before physicians may obtain their consent to perform medical or surgical treatments.  Hawaii Revised Statutes (HRS) §671-3(b) (Supp. 2012) provides the following:

> §671-3 Informed consent.  (a) . . .
>
> (b) The following information shall be supplied to the patient or the patient's guardian or legal surrogate prior to obtaining consent to a proposed medical or surgical treatment or diagnostic or therapeutic procedure:
>
> > (1) The condition to be treated;
> >
> > (2) A description of the proposed treatment or procedure;
> >
> > (3) The intended and anticipated results of the proposed treatment or procedure;
> >
> > (4) The recognized alternative treatments or procedures, including the option of not providing these treatments or procedures;
> >
> > (5) The recognized material risks of serious complications or mortality associated with:
> >
> > > (A) The proposed treatment or procedure;
> > >
> > > (B) The recognized alternative treatments or procedures; and
> > >
> > > (C) Not undergoing any treatment or procedure; and
> >
> > (6) The recognized benefits of the recognized alternative treatments or procedures.

In order to establish a claim of negligent failure to obtain informed consent, Plaintiffs must demonstrate the following:

> (1) the physician owed a duty to disclose to the patient the risk of one or more of the collateral injuries that the patient suffered;
>
> (2) the physician breached [that] duty;
>
> (3) the patient suffered injury;
>
> (4) the physician's breach of duty was a cause of the patient's injury in that:
>
> > (a) the physician's treatment was a substantial factor in bringing about the patient's injury and

> (b) the patient, acting rationally and reasonably, would not have undergone the treatment had [they] been informed of the risk of the harm that in fact occurred; and

> (5) no other cause is a superseding cause.

Bernard v. Char, 79 Hawai'i 362, 365, 371, 903 P.2d 667, 670 (1995) (citation and brackets omitted and format altered).

Further, to maintain an informed consent claim, "a plaintiff . . . is required to prove by expert medical evidence the materiality of the risk of harm to which the plaintiff was subjected." Carr v. Strode, 79 Hawai'i 475, 487, 904 P.2d 489, 501 (1995) (emphasis added). Plaintiffs must prove the "materiality of the risk" by "adducing expert medical testimony to establish the nature of risks inherent in a particular treatment, the probabilities of therapeutic success, the frequency of the occurrence of particular risks, and the nature of available alternatives to treatment." Id. at 486, 904 P.2d at 500 (citation and internal quotation marks omitted). Testimony from Dr. Nguyen, the defendant-doctor in this case, may be used to meet Plaintiffs' expert medical evidence burden required to prove an informed consent claim. Id. at 487, 904 P.2d at 501 (citing Nishi v. Hartwell, 52 Haw. 188, 196-97, 473 P.2d 116, 121 (1970)), overruled in part by Carr.

The circuit court correctly awarded judgment as a matter of law to Defendants on Plaintiffs' informed consent claim because expert testimony presented at trial does not sufficiently establish the "materiality of the risk of harm" imposed by Dr. Nguyen's administration of ten milligrams of Reglan to Jennifer.[7]

---

[7] The lack of expert testimony as to the materiality of the risk of Reglan was one basis upon which the circuit court granted Defendants' Motion for Judgment as a matter of law:

> [circuit court]: All right. I've heard enough[.]

> Respectfully, I disagree with counsel for plaintiffs on this one. I think the issue essentially is there's not a legally cognizable informed consent claim in this case. I think when the complaint was filed it was kind of thrown [in] without looking carefully at the elements of informed consent, without looking carefully at the statute that governs the whole issue of informed consent and it's why I specifically asked the doctor the question I did because I heard the answer that he gave when [Defense counsel] asked

(continued...)

Specifically, in the instant case, expert testimony was not adduced to establish the "probabilities of therapeutic success" or "the frequency of the occurrence of particular risks" and therefore Plaintiffs failed to carry their evidentiary burden. Carr, 79 Hawai'i at 486, 904 P.2d at 500.

Testimony from Plaintiffs' standard of care expert, Dr. Towle, did not sufficiently elaborate on the probabilities that Reglan treatment would be successful and thus did not meet one

---

[7](...continued)
the question and I wanted to make sure that I had heard correctly and the record is crystal clear on this.

In the [circuit court's] view, not only is there no expert testimony, as is required as [Defense counsel] has said and I agree with [Defense counsel's] argument on that one, the parents were never -- the parents, for example, were never asked whether if they had been informed of certain things they would have given permission, etc., etc., which are the elements of informed consent.

I'm looking at the elements of informed consent that are statutory and that are reflected in the proposed [circuit court's] jury instruction. In the [circuit court's] view what you got -- what we've got here is a case of medical negligence, period. Informed consent may sound like -- may sound viable sort of in some sort of common sensible view, well, he should have told the parents about Reglan and what it could cause, etc. But when you look at the statutory elements and you look at the jury instructions, etc., in the [circuit court's] view there simply is no legally cognizable claim for informed consent on the facts of this case.

And you add that to -- and in a sense that's why there was no expert testimony on materiality because it's simply not an informed consent case. And all you've got is what Dr. Towle said in answer to both [defense counsel's] question and the [circuit court's] question. I can't answer that he says. Shouldn't have given Reglan to begin with. How can they even cognizably consent to it then?

So, in the [circuit court's] view, the [circuit court] finds that the evidence presented on the claim of informed consent and the inferences drawn from the evidence such as it is on that claim, even when viewed in the light most favorable to the plaintiffs in this case are such that a reasonable jury could not find in favor of the [P]laintiffs on the issue of informed consent, and therefore, should not be submitted to the jury, the motion for judgment as a matter of law on the informed consent claim is granted.

(Emphasis added.)

element of Plaintiffs' burden of presenting medical evidence on their informed consent claim. See Carr, 79 Hawai'i at 486, 904 P.2d at 500. Dr. Towle declined to opine on whether risks of harm should have been explained to Jennifer's parents because Reglan "[s]hould not have been given [to Jennifer] no matter what in these circumstances."

Plaintiffs contend:

> [i]f the risk of a given procedure is so great that it should never be performed or used in the first instance, yet the physician goes ahead with it, and does so after not warning the minor patient's parents of any of the risks involved, that physician should not obtain the benefit of avoiding application of the doctrine of informed consent.

Plaintiffs, however, incorrectly characterize Dr. Towle's testimony as indicating the "risk in question [with Reglan] was so great that on the issue of materiality, [Plaintiffs'] expert testified he would simply never have held a discussion with Jennifer's parents on the risks in question." (Emphasis added.) Dr. Towle did not opine that the material risks were "so great[,]" but rather that Reglan should not have been prescribed in Jennifer's particular circumstances without further elaboration.

Although Dr. Towle's testimony indicated that Reglan posed a greater risk of gastric motility, i.e. diarrhea, than other anti-emetics, his testimony did not establish the frequency of the occurrence or the significance of that risk. Plaintiffs therefore also failed to adduce sufficient expert testimony regarding this aspect of the "materiality of the risk of harm."

Plaintiffs contend Dr. Nguyen's testimony establishes the materiality of risks with respect to Reglan. Dr. Nguyen testified diarrhea is a side effect of Reglan. Plaintiffs' counsel admitted Plaintiffs' Exhibit P-64 into evidence. It was a printout of the FDA manufacturer's warning and informational description for Reglan and current at the time Dr. Nguyen prescribed Reglan to Jennifer. Dr. Nguyen was aware of this

warning when he prescribed Reglan to Jennifer.  The FDA manufacturer's warning states:

> CONTRAINDICATIONS
> [Reglan] should not be used whenever stimulation of gastrointestinal motility might be dangerous, e.g., in the presence of gastrointestinal hemorrhage, mechanical obstruction or perforation.
>
> . . . .
>
> Pediatric Use
> Safety and effectiveness in pediatric patients have not been established (see OVERDOSAGE).
>
> . . . .
>
> The safety profile of [Reglan] in adults cannot be extrapolated to pediatric patients.
>
> . . . .
>
> ADVERSE REACTIONS
> In general, the incidence of adverse reactions correlates with the dose and duration of [Reglan] administration.  The following reactions have been reported, although in most instances, data do not permit an estimate of frequency:
>
> . . . .
>
> Gastrointestinal
> Nausea and bowel disturbances, primarily diarrhea.

Plaintiffs argue thereafter that the manufacturer's warning, "[s]afety and effectiveness [of Reglan] in [treating] pediatric patients [has] not been established," would satisfy Plaintiffs' medical evidence burden of proving the "materiality of risk" because a legitimate inference from the warning is that it establishes the "probabilities of therapeutic success[.]" Carr, 79 Hawai'i at 486, 904 P.2d at 500 (citation and internal quotation marks omitted).  On March 9, 2009, Plaintiffs' counsel argued "[t]hat [materiality of the risk] is recited by the drug manufacturer.  [Defendants] didn't object to [Plaintiffs' Exhibit P-64] coming into evidence.  That's competent expert evidence[.] . . . Doesn't have to be by a live witness.  [Defendants] agreed the drug company knows more about [Reglan] than anyone.  The drug company says that[] [using Reglan to treat pediatric patients is] a risk."

18

Contrary to Plaintiffs' contention, however, the manufacturer's warning, in and of itself, does not establish the materiality of risk of harm with respect to Reglan, because it does not constitute "expert testimony" and does not permit a legitimate inference regarding the materiality of the risk. See Craft v. Peebles, 78 Hawaiʻi 287, 306, 893 P.2d 138, 157 (1995) (holding correct a jury instruction that stated "an action based on informed consent must establish the applicable standard of care through expert medical testimony and manufacturer's package inserts do not, by themselves, set the standard of care which is applicable to a physician on the issue of informed consent.") (brackets omitted).

Craft discussed the relevance of manufacturer's inserts to the standard of care in a negligence action:

> [W]e think the better rule is that manufacturers' inserts and parallel P.D.R. [Physician's Desk Reference] entries do not by themselves set the standard of care, even as a prima facie matter. A manufacturer's recommendations are, however, some evidence that the finder of fact may consider along with expert testimony on the standard of care.
>
> . . . .
>
> Although package inserts may provide useful information, they are not designed to establish a standard of medical practice, and their conflicting purposes make it extremely unlikely that they could be so designed.
>
> . . . .
>
> The American Medical Association, while recognizing inserts as one useful source of information, has repeatedly alleged that inserts are an inadequate standard for medical practice, pointing to the inconsistent purposes served by the document[s]-advertising for the manufacturer, regulation by the government, and information for the doctor-and to the poor quality of past inserts.
>
> . . . .
>
> '[D]ifferences between the package insert and accepted medical practice represent the difference between the rigorous proof a regulatory agency must demand and the clinical judgment of a physician based on his [or her] training, experience, and skill as related to the needs of his [or her] individual patient. One cannot be taken as a standard for the other.'

19

Craft, 78 Hawai'i at 300, 893 P.2d at 151 (quoting Ramon v. Farr, 770 P.2d 131 at 135-36 (Utah 1989) (emphasis omitted)).

Addressing Craft, this court noted that "in informed consent cases, the standard of disclosure, rather than the standard of care, is at issue." Bernard v. Char, 79 Hawai'i 371, 382 n. 13, 903 P.2d 676, 687 n. 13 (App. 1995). The Hawai'i Supreme Court further clarified, "[t]he instruction in Craft is therefore accurate to the extent that it requires expert medical testimony to establish 'materiality.' However, the opinion in Craft should not be interpreted to require expert medical testimony to establish the standard of disclosure." Carr, 79 Hawai'i at 486 n. 7, 904 P.2d at 500 n. 7. While these cases do not clarify the affirmative role that a manufacturer's warning label may serve towards establishing Plaintiffs' missing factors of the "materiality of risks" evidentiary burden (testimony on "the probabilities of therapeutic success" and "frequency of the occurrence of particular risks"), they agree that a manufacturer's warning cannot substitute for expert testimony. Id.

Our conclusion that no legitimate inference about the materiality of risks supporting an informed consent claim can be drawn from the Reglan manufacturer warning is consistent with case law in other jurisdictions, which hold that testimony that a treatment may or may not be safe does not establish risks pertinent to an informed consent issue. See Southard v. Temple Univ. Hosp., 781 A.2d 101 (Pa. 2001) ("We disagree that these 'unknown consequences' in the context of an FDA review equate to 'risks' or 'facts' pertinent to the informed consent inquiry. The fact that the FDA had not yet garnered sufficient information in its review process to conclude that there is a reasonable assurance of safety to classify the screws for a particular use is not a qualitative determination that the device is risky or unsafe."); Klein v. Biscup, 673 N.E.2d 225, 231 (Ohio App. 1996), appeal not allowed, 667 N.E.2d 987 (Ohio 1996) ("the FDA does not

20

regulate the practice of medicine[,]" and holding "[o]ff-label use of a medical device is not a material risk inherently involved in a proposed therapy which a physician should disclose to a patient prior to the therapy"); Univ. of Maryland Med. Sys. Corp. v. Waldt, 983 A.2d 112, 129 (Md. 2009) (a proffer of expert testimony that the procedure "was contraindicated for [the patient], and therefore should not have been performed on her . . . [and] would be relevant to an ordinary negligence claim . . . [but] is not relevant to an informed consent claim. . . . We agree with the intermediate court that no testimony was proffered concerning the material risks of the procedure that would make out a prima facie case for informed consent."). We then cannot infer that the Reglan manufacturer's warning that the "[s]afety and effectiveness in pediatric patients [has] not been established" constituted expert testimony on "the probabilities of therapeutic success, [or] the frequency of the occurrence of particular risks[.]" Carr, 79 Hawaiʻi at 486, 904 P.2d at 500.

Dr. Towle also testified the language in the manufacturer's insert for the drug Reglan is equivocal. According to Dr. Towle, the phrases "[s]afety and effectiveness in pediatric patients [has] not been established" and "[t]he safety profile of [Reglan] in adults cannot be extrapolated to pediatric patients[,]" means the manufacturer "can't say it's safe but they don't say it's not safe either. They just haven't determined it. It's undetermined. May be safe, may not be." Dr. Towle's testimony further supports our conclusion the Reglan manufacturer's FDA warning does not supply expert testimony on the probabilities of Reglan's therapeutic success or the frequency of any risks in support of Plaintiffs' informed consent claim.

Because Plaintiffs failed to establish the materiality of risk of harm with respect to Reglan, the circuit court properly granted judgment as a matter of law in favor of

Defendants on Plaintiffs' informed consent claim.

Plaintiffs also offer a related contention that Dr. Nguyen failed to provide statutorily mandated information to Jennifer's parents other than the risks of Reglan. They also point to Dr. Nguyen's testimony that he knew of a safer, alternative medicine (Zofran) as further evidence of this failure. Because Plaintiffs failed to raise this argument to the circuit court, they have waived this claim on appeal. See State v. Hoglund, 71 Haw. 147, 150, 785 P.2d 1311, 1313 (1990) ("Generally, the failure to properly raise an issue at the trial level precludes a party from raising that issue on appeal.").

In conclusion, Defendants' Motion for Judgment was properly granted because Plaintiffs failed to present sufficient expert testimony as to the materiality of the risks of Reglan so as to sufficiently support their informed consent claim.

**B.    Plaintiffs' claims pertaining to civil battery**

With respect to the issue of civil battery, Plaintiffs argue the circuit court erred by 1) prohibiting Plaintiffs from amending their Complaint to conform to the evidence on the issue of battery, 2) refusing to enter judgment as a matter of law in Plaintiffs' favor on the claim of battery, and 3) not allowing the claim of battery to go to the jury.

1.    Plaintiffs' motion to conform the pleadings to evidence of battery

Plaintiffs contend the circuit court erred by denying their motion to conform the pleadings to the evidence to assert the claim of battery. At the time of the trial, HRCP Rule 15(b)(1) provided:

> (b) Amendments during and after trial.
>
> (1) FOR ISSUES TRIED BY CONSENT. When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment[.]

When a party seeks to amend the pleadings pursuant to Rule 15(b), the critical question is whether the unpleaded issue was tried by the implied consent of the parties. Hamm v. Merrick, 61 Haw. 470, 472, 605 P.2d 499, 501 (1980). Appellate courts review a denial of a HRCP Rule 15(b) motion for leave to amend a complaint under the abuse of discretion standard. See Kamaka v. Goodsill Anderson Quinn & Stifel, 117 Hawai'i 92, 104, 176 P.3d 91, 103 (2008) (citing Hamm, 61 Haw. at 473, 605 P.2d at 502).

Plaintiffs claim the medical battery issue was tried by the implied consent of the Defendants because testimony introduced pertained to medical battery. Specifically, Plaintiffs contend: (1) Dr. Towle testified that Dr. Nguyen had breached the applicable standard of care by administering Reglan to Jennifer; (2) Dr. Nguyen testified he did not warn Plaintiffs of any risks of Reglan; and (3) Defendants repeatedly failed to object to the introduction of evidence relevant to Plaintiffs' medical battery claim. However, the evidence to which Defendants failed to object was relevant to Plaintiffs' medical negligence and informed consent claims, and consent will not be implied under HRCP Rule 15(b) "when the evidence that is claimed to show that an issue was tried by consent is relevant to an issue already in the case, as well as to the one that is the subject matter of the amendment, and there was no indication at trial that the party who introduced the evidence was seeking to raise a new issue[.]" Kamaka, 117 Hawai'i at 113, 176 P.3d at 112 (block quote format altered, citations and brackets omitted). Under this test, Plaintiffs' implied consent argument fails. In any event, the testimony cited by Plaintiffs is not relevant to a medical battery claim. Instead, as Defendants cogently contend, Plaintiffs attempt to resuscitate an informed consent claim under

23

the guise of "medical" or "civil" battery.[8]

In <u>Nishi</u>, the Hawaiʻi Supreme Court distinguished between claims of battery and informed consent:

> <u>Battery is an unlawful touching of another person without his consent</u>. *Schloendorff v. Society of New York Hospital*, 211 N.Y. 125, 105 N.E. 92 (1914). A touching with consent, but of a different nature or scope from that to which consent was given, is also battery. *Bang v. Charles T. Miller Hospital*, 251 Minn. 427, 88 N.W.2d 186 (1958); *Gray v. Grunnagle*, 423 Pa. 144, 223 A.2d 663 (1966).
>
> <u>This case is different. Here, the touching was with consent and was of the same nature and scope as that to which the consent was given, but involved an undisclosed collateral hazard. Cases such as this involved the doctrine of informed consent, and are deemed to sound in negligence,</u> as raising the question of a neglect of duty required to be observed by a physician in his relationship with the patient. *Natanson v. Kline*, 186, Kan. 393, 350 P.2d 1093, rehearing denied, 187 Kan. 186, 354 P.2d 670 (1960); *Aiken v. Clary*, 396 S.W.2d 668 (Mo. 1965); Marcus L. Plante, An Analysis of 'Informed Consent', 36 Fordham L. Rev. 639 (1968).

<u>Nishi</u>, 52 Haw. at 190-91, 473 P.2d at 118-19 (emphases added).

The Ninth Circuit has also distinguished "*medical battery* (where the doctor has failed to obtain any authorization, or has gone well beyond the authorization given) and a *negligent failure to disclose,* with the latter sounding in negligence, rather than battery." <u>Ditto v. McCurdy</u>, 510 F.3d 1070, 1077 (9th Cir. 2007).

> The action for informed consent, ultimately, focuses on the reasonableness of the physician's disclosure to the patient. It is the breach of this duty to disclose all the material risks a patient would need to determine his or her course of treatment, and the breach's causation of physical injury, that give rise to an action for informed consent.

<u>Id.</u> at 510 F.3d at 1078 (citations omitted).

Plaintiffs' motion was appropriately denied because the evidence in this case does not support a medical battery claim, therefore it could not have been tried by implied consent.

---

[8]    We note that few jurisdictions, Hawaiʻi not being one of them, have permitted battery claims in non-surgical cases where patients were unaware that they were being given medication. <u>See</u> <u>Mink v. Univ. of Chicago</u>, 460 F. Supp. 713 (D.C. Ill. 1978), <u>and</u> <u>Duncan v. Scottsdale Med. Imaging, Ltd.</u>, 70 P.3d 435 (Ariz. 2003).

First, Plaintiffs' citations to the record do not support their contention that battery occurred. The undisputed facts are: Jennifer's family brought Jennifer to the emergency room because they were worried about her vomiting and diarrhea; Jennifer's mother, father, and brother Anthony were with Jennifer the entire time she was in the hospital; Mother witnessed the presence of an IV in Jennifer's arm; and the family was present when Reglan was administered by IV. Dr. Nguyen testified that before he prescribed Reglan for Jennifer intravenously, he informed the parents he was giving Jennifer medication for nausea, and they agreed. Dr. Nguyen also gave Jennifer a prescription for Reglan tablets before the family left the hospital, and the family filled the prescription and gave Reglan pills to Jennifer when she was at home. Father's testimony is the only evidence that may be construed to indicate the family was not informed about IV administration of Reglan. Father testified:

> [Defense counsel:] And you also understood that a medicine was given to stop [Jennifer] from vomiting?
>
> [Father:] Oh, I don't know about that, because about the medicine, the doctor, he don't tell me nothing about what kind medicine he give to my daughter, and what the medicine work.

Even if Father's testimony raised a factual dispute as to whether Dr. Nguyen informed the family he was administering Reglan by IV, Plaintiffs did not make such an argument in their oral motion to conform the pleadings to the evidence, and thus the argument is waived.[9]

Second, Plaintiffs contend Dr. Nguyen's failure to obtain Jennifer's parents' informed consent for Reglan treatments "constituted a medical battery." Plaintiffs assert, "never at

---

[9] Plaintiffs' contention on appeal that the family was unaware Dr.Nguyen was treating Jennifer with anti-nausea medication is waived because Plaintiffs did not raise this argument in circuit court when they moved to amend the pleadings to assert a claim for battery. See Hoglund, 71 Haw. at 150, 785 P.2d at 1313.

any time had Dr. Nguyen ever told them anything about the type of medication he planned to give, and did give, to Jennifer, or its side effects." Plaintiffs' emphasis on Dr. Nguyen's failure to warn them of any risks of Reglan raises the question of whether those risks were material and were required to be disclosed. Plaintiffs failed to establish the "materiality of the risk" of the harm of Reglan administration, and likewise cannot sustain a battery claim based on Dr. Nguyen's failure to obtain their informed consent. Ditto, 510 F.3d at 1077-78; Carr, 79 Hawaiʻi at 486, 904 P.2d at 500; Bailey-Null v. ValueOptions, 209 P.3d 1059, 1066 (Ariz. App. 2009) (healthcare provider committed medical battery when they caused patient to be injected with medication without her informed consent).

Third, Plaintiffs claim that Dr. Nguyen's use of Reglan was authorized with inadequate information, or that there were "undisclosed collateral hazard[s]" of Reglan which render their consent ineffective, sounds in negligence, not in battery. See Nishi, 52 Haw. at 191, 473 P.2d at 118. Battery is an intentional tort and "intent" denotes a situation in which "the actor desires to cause consequences of his act, or that he believes the consequences are substantially certain to result from it." Ditto, 510 F.3d at 1078 (citation and internal quotation mark omitted) (holding that a defendant surgeon did not act with either the desire to injure or a belief that injury was substantially certain to occur so as to commit medical battery). Plaintiffs have offered no evidence Dr. Nguyen acted with the requisite desire or belief so as to fall within the definition of battery. See also Williams v. Aona, 121 Hawaiʻi 1, 13, 210 P.3d 501, 513 (2009) (defining battery as bodily contact with a plaintiff "in a way not justified by the plaintiff's apparent wishes or by a privilege, and the contact is in fact harmful or against the plaintiffs' will[]") (citation and internal quotation marks omitted).

In conclusion, evidence cited by Plaintiffs does not

26

justify amending the complaint and goes towards a claim of medical negligence rather than civil battery. See Ditto, 510 F.3d at 1077-78. Accordingly, the circuit court did not err in denying Plaintiffs' motion to amend their pleadings to include the issue of medical battery.

2. Plaintiffs' motions for judgment as a matter of law on the claim of medical battery and a new trial

At the close of Plaintiffs' case in chief, Plaintiffs moved for the Motion for Judgment on their claim for medical battery. Plaintiffs again moved for the Motion for Judgment on the same claim at the close of evidence. On August 10, 2009, Plaintiffs filed its Renewed Motion. The circuit court did not err by denying these motions.

Plaintiffs argue the jury verdict is contrary to the overwhelming weight of the evidence because if the Plaintiffs were allowed to amend their complaint, the weight of the evidence would have clearly supported a verdict in favor of Plaintiffs on the medical battery claim.

Plaintiffs support their contention the circuit court erred when it failed to grant Plaintiffs' motion for a new trial on its battery claim because the jury's verdict was against the manifest weight of the evidence adduced at trial. Plaintiffs point out that in a motion for a new trial, the movant need only convince the court the verdict rendered for the opponent is against the manifest weight of the evidence. See Stanford Carr Dev. Corp. v. Unity House Inc., 111 Hawai'i 286, 296-97, 141 P.3d 459, 469-70 (2006).

As discussed supra, Plaintiffs do not present a cognizable claim for medical battery, and the circuit court properly denied Plaintiffs' motion to conform the pleadings to the evidence to assert the claim of battery. Therefore, we do not reach Plaintiffs' additional arguments with respect to their medical battery claim.

## V. CONCLUSION

The July 28, 2009 Final Judgment entered in the Circuit Court of the First Circuit is affirmed.

DATED:  Honolulu, Hawai'i, December 30, 2013.

On the briefs:

John S. Edmunds
Ronald J. Verga
Joy S. Omonaka
(Edmunds Verga & Omonaka)
for Plaintiff-Appellant Leo
Young, Esq., in his capacity
as Personal Representative of
the Estate of Jennifer Giao
Nguyen, Deceased.

Michael J.Y. Wong
Plaintiffs-Appellants CUC Thi
Ngo, Angelo Nguyen, Anthony
Nguyen, An Van Nguyen.

Edmund Burke
Jan M. Tamura
John Reyes-Burke
(Burke McPheeters Bordner &
Estes)
for Defendants-Appelleess
Thinh T. Nguyen, M.D. and The
Emergency Group, Inc.

Chief Judge

Associate Judge

Associate Judge